FILED IN OPEN C[illegible]
JACKSONVILLE, FLORID[illegible]
8/25/26
U.S. DISTRICT COURT
MIDDLE DISTRICT OF FLORIDA

UNITED STATES DISTRICT COURT
MIDDLE DISTRICT OF FLORIDA
JACKSONVILLE DIVISION

UNITED STATES OF AMERICA

v. CASE NO. 3:26-cr-167-MMH-PDB

GEORGE JOSHUA FLOYD

# PLEA AGREEMENT

Pursuant to Fed. R. Crim. P. 11(c), the United States of America, by Gregory W. Kehoe, United States Attorney for the Middle District of Florida, and the defendant, GEORGE JOSHUA FLOYD, and the attorney for the defendant, John Rockwell, Esq., mutually agree as follows:

## A. Particularized Terms

### 1. Count Pleading To

The defendant shall enter a plea of guilty to Count One of the Information. Count One charges the defendant with wire fraud, in violation of 18 U.S.C. §§ 1343 and 2.

### 2. Maximum Penalties

Count One carries a maximum sentence of 20 years' imprisonment, a fine of not more than $250,000, or twice the gross gain caused by the offense, or twice the gross loss caused by the offense, whichever is greater, a term of supervised release of not more than 3 years, and a special assessment of $100.

With respect to certain offenses, the Court shall order the defendant to make restitution to any victim of the offense, and with respect to other offenses, the Court may order the defendant to make restitution to any victim of the offense, or to the community, as set forth below.

3. **Elements of the Offense**

The defendant acknowledges understanding the nature and elements of the offense with which the defendant has been charged and to which the defendant is pleading guilty. The elements of Count One are:

First: The defendant knowingly devised or participated in a scheme to defraud, or to obtain money or property by using false pretenses, representations, or promises;

Second: The false pretenses, representations, or promises were about a material fact;

Third: The defendant acted with the intent to defraud; and

Fourth: The defendant transmitted or caused to be transmitted by wire some communication in interstate commerce to help carry out the scheme.

4. **Indictment Waiver**

The defendant will waive the right to be charged by way of indictment before a federal grand jury.

5. **No Further Charges**

If the Court accepts this plea agreement, the United States Attorney's Office for the Middle District of Florida agrees not to charge the defendant with committing any other federal criminal offenses known to the United States

Attorney's Office at the time of the execution of this agreement, related to the conduct giving rise to this plea agreement.

6. **Mandatory Restitution to Victims**

Pursuant to 18 U.S.C. § 3663A(a) and (b), defendant agrees to make full restitution to the victims of the offense, including Restaurant-1 and the victim investors that invested in Restaurant-2.

7. **Acceptance of Responsibility - Three Levels**

At the time of sentencing, and in the event that no adverse information is received suggesting such a recommendation to be unwarranted, the United States will recommend to the Court that the defendant receive a two-level downward adjustment for acceptance of responsibility, pursuant to USSG §3E1.1(a). The defendant understands that this recommendation or request is not binding on the Court, and if not accepted by the Court, the defendant will not be allowed to withdraw from the plea.

Further, at the time of sentencing, if the defendant's offense level prior to operation of subsection (a) is level 16 or greater, and if the defendant complies with the provisions of USSG §3E1.1(b) and all terms of this plea agreement, including, but not limited to, the timely submission of the financial affidavit referenced in Paragraph B.5., the United States agrees to file a motion pursuant to USSG §3E1.1(b) for a downward adjustment of one additional level. The defendant understands that the determination as to whether the defendant has qualified for a downward adjustment of a third level for acceptance of responsibility rests solely

with the United States Attorney for the Middle District of Florida, and the defendant agrees that the defendant cannot and will not challenge that determination, whether by appeal, collateral attack, or otherwise.

8. **Forfeiture of Assets**

The defendant agrees to forfeit to the United States immediately and voluntarily any and all assets and property, or portions thereof, subject to forfeiture, pursuant to 18 U.S.C. § 981(a)(1)(C) and 28 U.S.C. § 2461(c), whether in the possession or control of the United States, the defendant or defendant's nominees.

The assets to be forfeited specifically include, but are not limited to, the $1,159,596.26 in proceeds the defendant admits he obtained, as a result of the commission of the offense charged in Count One to which the defendant is pleading guilty. The defendant acknowledges and agrees that: (1) the defendant obtained this amount as a result of the commission of the offense, and (2) as a result of the acts and omissions of the defendant, the proceeds have been transferred to third parties and cannot be located by the United States upon the exercise of due diligence. Therefore, the defendant agrees that, pursuant to 21 U.S.C. § 853(p), the United States is entitled to forfeit any other property of the defendant (substitute assets), up to the amount of proceeds the defendant obtained, as the result of the offense of conviction. The defendant further consents to, and agrees not to oppose, any motion for substitute assets filed by the United States up to the amount of proceeds obtained from commission of the offense and consents to the entry of the forfeiture order into

the Treasury Offset Program. The defendant agrees that forfeiture of substitute assets as authorized herein shall not be deemed an alteration of the defendant's sentence.

The defendant additionally agrees that since the criminal proceeds have been transferred to third parties and cannot be located by the United States upon the exercise of due diligence, the preliminary and final orders of forfeiture should authorize the United States Attorney's Office to conduct discovery (including depositions, interrogatories, requests for production of documents, and the issuance of subpoenas), pursuant to Rule 32.2(b)(3) of the Federal Rules of Criminal Procedure, to help identify, locate, and forfeit substitute assets.

The defendant also agrees to waive all constitutional, statutory, and procedural challenges (including direct appeal, habeas corpus, or any other means) to any forfeiture carried out in accordance with this Plea Agreement on any grounds, including that the forfeiture described herein constitutes an excessive fine, was not properly noticed in the charging instrument, addressed by the Court at the time of the guilty plea, announced at sentencing, or incorporated into the judgment.

The defendant admits and agrees that the conduct described in the Factual Basis below provides a sufficient factual and statutory basis for the forfeiture of the property sought by the government. Pursuant to Rule 32.2(b)(4), the defendant agrees that the preliminary order of forfeiture will satisfy the notice requirement and will be final as to the defendant at the time it is entered. In the event the forfeiture is omitted from the judgment, the defendant agrees that the

forfeiture order may be incorporated into the written judgment at any time pursuant to Rule 36.

The defendant agrees to take all steps necessary to identify and locate all substitute assets and to transfer custody of such assets to the United States before the defendant's sentencing. To that end, the defendant agrees to make a full and complete disclosure of all assets over which defendant exercises control, including all assets held by nominees, to execute any documents requested by the United States to obtain from any other parties by lawful means any records of assets owned by the defendant, and to consent to the release of the defendant's tax returns for the previous five years. The defendant agrees to be interviewed by the government, prior to and after sentencing, regarding such assets. The defendant further agrees to be polygraphed on the issue of assets, if it is deemed necessary by the United States. The defendant agrees that Federal Rule of Criminal Procedure 11 and USSG § 1B1.8 will not protect from forfeiture assets disclosed by the defendant as part of the defendant's cooperation.

The defendant agrees to take all steps necessary to assist the government in obtaining clear title to any substitute assets before the defendant's sentencing. In addition to providing full and complete information about substitute assets, these steps include, but are not limited to, the surrender of title, the signing of a consent decree of forfeiture, and signing of any other documents necessary to effectuate such transfers.

Forfeiture of the defendant's assets shall not be treated as satisfaction of any fine, restitution, cost of imprisonment, or any other penalty the Court may impose upon the defendant in addition to forfeiture.

The defendant agrees that, in the event the Court determines that the defendant has breached this section of the Plea Agreement, the defendant may be found ineligible for a reduction in the Guidelines calculation for acceptance of responsibility and substantial assistance, and may be eligible for an obstruction of justice enhancement.

The defendant agrees that the forfeiture provisions of this plea agreement are intended to, and will, survive the defendant, notwithstanding the abatement of any underlying criminal conviction after the execution of this agreement. The forfeitability of any particular property pursuant to this agreement shall be determined as if the defendant had survived, and that determination shall be binding upon defendant's heirs, successors and assigns until the agreed forfeiture, including the forfeiture of any substitute assets, is final.

**B. Standard Terms and Conditions**

**1. Restitution, Special Assessment and Fine**

The defendant understands and agrees that the Court, in addition to or in lieu of any other penalty, shall order the defendant to make restitution to any victim of the offense, pursuant to 18 U.S.C. § 3663A, for all offenses described in 18 U.S.C. § 3663A(c)(1); and the Court may order the defendant to make restitution to any victim of the offense, pursuant to 18 U.S.C. § 3663, including restitution as to all

counts charged, whether or not the defendant enters a plea of guilty to such counts, and whether or not such counts are dismissed pursuant to this agreement. The defendant further understands that compliance with any restitution payment plan imposed by the Court in no way precludes the United States from simultaneously pursuing other statutory remedies for collecting restitution (28 U.S.C. § 3003(b)(2)), including, but not limited to, garnishment and execution, pursuant to the Mandatory Victims Restitution Act, in order to ensure that the defendant's restitution obligation is satisfied.

On each count to which a plea of guilty is entered, the Court shall impose a special assessment pursuant to 18 U.S.C. § 3013. The special assessment is due on the date of sentencing. The defendant understands that this agreement imposes no limitation as to fine.

2. **Supervised Release**

The defendant understands that the offense to which the defendant is pleading provides for imposition of a term of supervised release upon release from imprisonment, and that, if the defendant should violate the conditions of release, the defendant would be subject to a further term of imprisonment.

3. **Immigration Consequences of Pleading Guilty**

The defendant has been advised and understands that, upon conviction, a defendant who is not a United States citizen may be removed from the United States, denied citizenship, and denied admission to the United States in the future.

4. **Sentencing Information**

The United States reserves its right and obligation to report to the Court and the United States Probation Office all information concerning the background, character, and conduct of the defendant, to provide relevant factual information, including the totality of the defendant's criminal activities, if any, not limited to the count to which defendant pleads, to respond to comments made by the defendant or defendant's counsel, and to correct any misstatements or inaccuracies. The United States further reserves its right to make any recommendations it deems appropriate regarding the disposition of this case, subject to any limitations set forth herein, if any.

5. **Financial Disclosures**

Pursuant to 18 U.S.C. § 3664(d)(3) and Fed. R. Crim. P. 32(d)(2)(A)(ii), the defendant agrees to complete and submit to the United States Attorney's Office within 30 days of execution of this agreement an affidavit reflecting the defendant's financial condition. The defendant promises that his financial statement and disclosures will be complete, accurate and truthful and will include all assets in which he has any interest or over which the defendant exercises control, directly or indirectly, including those held by a spouse, dependent, nominee or other third party. The defendant further agrees to execute any documents requested by the United States needed to obtain from any third parties any records of assets owned by the defendant, directly or through a nominee, and, by the execution of this plea agreement, consents to the release of the defendant's tax returns for the previous five

years. The defendant similarly agrees and authorizes the United States Attorney's Office to provide to, and obtain from, the United States Probation Office, the financial affidavit, any of the defendant's federal, state, and local tax returns, bank records and any other financial information concerning the defendant, for the purpose of making any recommendations to the Court and for collecting any assessments, fines, restitution, or forfeiture ordered by the Court. The defendant expressly authorizes the United States Attorney's Office to obtain current credit reports in order to evaluate the defendant's ability to satisfy any financial obligation imposed by the Court.

**6. Sentencing Recommendations**

It is understood by the parties that the Court is neither a party to nor bound by this agreement. The Court may accept or reject the agreement, or defer a decision until it has had an opportunity to consider the presentence report prepared by the United States Probation Office. The defendant understands and acknowledges that, although the parties are permitted to make recommendations and present arguments to the Court, the sentence will be determined solely by the Court, with the assistance of the United States Probation Office. Defendant further understands and acknowledges that any discussions between defendant or defendant's attorney and the attorney or other agents for the government regarding any recommendations by the government are not binding on the Court and that, should any recommendations be rejected, defendant will not be permitted to withdraw defendant's plea pursuant to this plea agreement. The government

expressly reserves the right to support and defend any decision that the Court may make with regard to the defendant's sentence, whether or not such decision is consistent with the government's recommendations contained herein.

**7. Defendant's Waiver of Right to Appeal the Sentence**

The defendant agrees that this Court has jurisdiction and authority to impose any sentence up to the statutory maximum and expressly waives the right to appeal defendant's sentence on any ground, including the ground that the Court erred in determining the applicable guidelines range pursuant to the United States Sentencing Guidelines, except (a) the ground that the sentence exceeds the defendant's applicable guidelines range as determined by the Court pursuant to the United States Sentencing Guidelines; (b) the ground that the sentence exceeds the statutory maximum penalty; or (c) the ground that the sentence violates the Eighth Amendment to the Constitution; provided, however, that if the government exercises its right to appeal the sentence imposed, as authorized by 18 U.S.C. § 3742(b), then the defendant is released from his waiver and may appeal the sentence as authorized by 18 U.S.C. § 3742(a).

**8. Middle District of Florida Agreement**

It is further understood that this agreement is limited to the Office of the United States Attorney for the Middle District of Florida and cannot bind other federal, state, or local prosecuting authorities, although this office will bring defendant's cooperation, if any, to the attention of other prosecuting officers or others, if requested.

**9. Filing of Agreement**

This agreement shall be presented to the Court, in open court or in camera, in whole or in part, upon a showing of good cause, and filed in this cause, at the time of defendant's entry of a plea of guilty pursuant hereto.

**10. Voluntariness**

The defendant acknowledges that defendant is entering into this agreement and is pleading guilty freely and voluntarily without reliance upon any discussions between the attorney for the government and the defendant and defendant's attorney and without promise of benefit of any kind (other than the concessions contained herein), and without threats, force, intimidation, or coercion of any kind. The defendant further acknowledges defendant's understanding of the nature of the offense or offenses to which defendant is pleading guilty and the elements thereof, including the penalties provided by law, and defendant's complete satisfaction with the representation and advice received from defendant's undersigned counsel (if any). The defendant also understands that defendant has the right to plead not guilty or to persist in that plea if it has already been made, and that defendant has the right to be tried by a jury with the assistance of counsel, the right to confront and cross-examine the witnesses against defendant, the right against compulsory self-incrimination, and the right to compulsory process for the attendance of witnesses to testify in defendant's defense; but, by pleading guilty, defendant waives or gives up those rights and there will be no trial. The defendant further understands that if defendant pleads guilty, the Court may ask defendant

questions about the offense or offenses to which defendant pleaded, and if defendant answers those questions under oath, on the record, and in the presence of counsel (if any), defendant's answers may later be used against defendant in a prosecution for perjury or false statement. The defendant also understands that defendant will be adjudicated guilty of the offenses to which defendant has pleaded and, if any of such offenses are felonies, may thereby be deprived of certain rights, such as the right to vote, to hold public office, to serve on a jury, or to have possession of firearms.

**11. Factual Basis**

Defendant is pleading guilty because defendant is in fact guilty. The defendant certifies that defendant does hereby admit that the facts set forth in the attached "Factual Basis," which is incorporated herein by reference, are true, and were this case to go to trial, the United States would be able to prove those specific facts and others beyond a reasonable doubt.

**12. Entire Agreement**

This plea agreement constitutes the entire agreement between the government and the defendant with respect to the aforementioned guilty plea and no other promises, agreements, or representations exist or have been made to the defendant or defendant's attorney with regard to such guilty plea.

**13. Certification**

The defendant and defendant's counsel certify that this plea agreement has been read in its entirety by (or has been read to) the defendant and that defendant fully understands its terms.

DATED this 24th day of July, 2026.

GREGORY W. KEHOE
United States Attorney

GEORGE JOSHUA FLOYD
Defendant

DAVID B. MESROBIAN
Assistant United States Attorney

JOHN ROCKWELL, ESQ.
Attorney for Defendant

MICHAEL J. COOLICAN
Assistant United States Attorney
Chief, Jacksonville Division

UNITED STATES DISTRICT COURT
MIDDLE DISTRICT OF FLORIDA
JACKSONVILLE DIVISION

UNITED STATES OF AMERICA

v. CASE NO. 3:26-cr-167-MMH-PDB

GEORGE JOSHUA FLOYD

**PERSONALIZATION OF ELEMENTS**

Count One

1. Did you knowingly devise or participate in a scheme to defraud, or to obtain money or property by using false pretenses, representations, or promises as alleged in the Information?

2. Were the false pretenses, representations, or promises about a material fact?

3. Did you act with the intent to defraud?

4. On or about September 19, 2024, did you transmit or cause to be transmitted by wire in interstate commerce a request for a bank ACH transfer in the amount of $20,000 to help carry out the scheme?

UNITED STATES DISTRICT COURT
MIDDLE DISTRICT OF FLORIDA
JACKSONVILLE DIVISION

UNITED STATES OF AMERICA

v. CASE NO. 3:26-cr-167-MMH-PDB

GEORGE JOSHUA FLOYD

**FACTUAL BASIS**

At all times relevant to this case, the defendant, GEORGE JOSHUA FLOYD, was a resident of Jacksonville in the Middle District of Florida. FLOYD worked in the hospitality industry.

**Restaurant-1**

From an unknown date but not later than in or around April 2022, FLOYD solicited individuals to invest money into a new restaurant he planned to open in Jacksonville ("Restaurant-1"). The defendant made various promises and representations to potential investors regarding the operation of Restaurant-1, and provided them with, among other things, an investment brochure, a business plan, and an operating agreement for Restaurant-1 in which the defendant was specified as the "Manager." The operating agreement and business plan contained a list of anticipated uses for the initial investment funds into Restaurant-1, including the purchase of the existing business/lease at Restaurant-1's location, leasehold improvements, pre-opening expenses, inventory, and other items. The operating agreement specifically promised to pay the investors a certain percentage of Restaurant-1's net cash flow (*i.e.*, profits) until their original "capital contributions"

were repaid plus a certain amount, and then a lower percentage thereafter. FLOYD would receive the remaining percentage. Under the operating agreement, FLOYD as Manager of Restaurant-1 was obligated, among other things, not to "do any act which is detrimental to the best interest of the Company or which would make it impossible to carry on the ordinary business of the Company," and not to take any action or incur any debt "that materially deviates from any approved Business Plan" without investor approval.

In 2022, FLOYD successfully solicited and received approximately $1.44 million in capital contributions for Restaurant-1 from victim investors. The defendant opened a business checking account at JPMorgan Chase Bank ("Chase") for Restaurant-1's operating funds in or around March 2022, ending in -1840 (the "Operating Account"), for which he was the sole signatory at all relevant times. Restaurant-1's business checking account had an associated debit card, and FLOYD also opened and controlled a Chase business credit card in the name of "George J Floyd, [Restaurant-1]", with an account number ending in -1150 (the "Business Card"). The bills for the Business Card were paid out of the Operating Account. FLOYD also had a personal checking account at Chase, ending in -3716 (the "Personal Account"). At all relevant times, Chase processed wire transfers sent to and from its accounts via servers located outside the state of Florida.

Restaurant-1 opened in Jacksonville in or around November 2022, and generated significant business and cash flow. FLOYD managed and controlled the financial statements and accounting for Restaurant-1, which he did not share with

the victim investors. Despite Restaurant-1's success, victim investors also did not receive regular distributions in accordance with the operating agreement, nor did they receive any corresponding tax forms or financial documents. During this period, FLOYD was also receiving regular salary payments through Restaurant-1's standard payroll processing system.

In or around March 2025, victim investors heard rumors about financial problems at Restaurant-1 and questioned FLOYD as to the status of their investment distributions. The defendant approached several investors and advised them, in sum and substance, that he had caused Restaurant-1 to be heavily in debt due to his having obtained merchant cash advance loans (*i.e.*, loans where the lenders provide upfront capital in exchange for taking repayment through a set percentage of the borrower's transactions) without approval from the investors. FLOYD stated that he had taken money from Restaurant-1 and used it, among other things, to invest in cryptocurrency and other investments, which he ultimately lost. FLOYD promised to repay Restaurant-1 and the investors, and ultimately made several payments as restitution, including a series of payments in early 2025 and a $100,000 payment on or about June 13, 2025. The investors undertook to terminate FLOYD as manager of Restaurant-1, examined the financials, and ultimately contacted the Federal Bureau of Investigation ("FBI").

The FBI's investigation established that from an unknown date but no later than 2023, the defendant embezzled funds from and caused losses to Restaurant-1 in multiple ways. The defendant made cash withdrawals from the

Operating Account, which he either deposited into his Personal Account or deposited into his account with a local casino company for gambling purposes. He made direct wire or ACH transfers from the Operating Account into his Personal Account, and converted the funds to his personal benefit. He used the Restaurant-1 Business Card for unauthorized personal expenses, such as payments to overseas gambling companies, which were paid out of the Operating Account. FLOYD also caused Restaurant-1 to enter into merchant cash advance loans—the capital proceeds of which he generally transferred to himself or used to cover the deficit in the Operating Account—which then caused Restaurant-1 to owe significant interest and fees to the lenders. The FBI also identified instances where FLOYD transferred funds from his Personal Account back into the Operating Account, which appeared to generally correspond to times when the Operating Account had a low balance and was unable to make payroll or other necessary legitimate expenditures.

One such fraudulent transfer occurred on or about September 19, 2024, when FLOYD submitted a request via the internet for an ACH transfer from the Operating Account to his Personal Account in the amount of $20,000. That same day, he caused a second ACH transfer from the Operating Account to his Personal Account in the amount of $10,000. FLOYD used the embezzled funds for his own benefit by transferring them to a personal online brokerage account, purchasing cryptocurrency via Paypal, conducting peer-to-peer transactions, and paying personal bills and expenses. He received his standard payroll payment from Restaurant-1 on September 26, 2024, in the amount of $2,989.84.

Restaurant-1's total losses caused by FLOYD's fraudulent conduct were approximately:

| **Type** | **Amount** |
| --- | --- |
| Cash Withdrawals | $236,500.00 |
| Credit Card Transactions | $22,430.26 |
| Transfers to Personal Account | $704,800.00 |
| Loan Interest & Fees | $237,937.30 |
| Funds Returned Prior to Discovery of Fraud | ($374,134.00) |
| **Total** | **$827,533.56** |

Since the discovery of the fraud, FLOYD has repaid Restaurant-1 additional funds of at least $160,000.

In the course of its investigation, the FBI examined the source of the funds which FLOYD used to replace money he stole from Restaurant-1, and identified additional victims of FLOYD's fraud scheme as set forth below.

**Restaurant-2**

FBI interviews with victim investors and employees established that in or around 2024, while employed as Manager of Restaurant-1, FLOYD began discussing the prospect of opening a second restaurant concept ("Restaurant-2") in Clay County, in the Middle District of Florida. Restaurant-2 remains in development and has never opened.

FLOYD also solicited some of the investors and employees of Restaurant-1 to invest in Restaurant-2 as well. One employee convinced two of his relatives (Victim-1 and Victim-2) to invest a total of $20,000 in August 2024 into FLOYD's concept for Restaurant-2, after FLOYD provided a contract. FLOYD immediately stole their money by using it to pay credit card bills and school tuition, transferring their funds to his personal online brokerage account, and sending money via peer-to-peer transactions. After the fraud at Restaurant-1 was discovered, FLOYD confessed to the employee that he had been struggling financially, and taken out unauthorized loans and stolen Restaurant-1 funds to play a "crypto game" through which he then lost the money. FLOYD repaid Victim-1 and Victim-2 in May 2025 after he was fired from Restaurant-1.

In or around October 2024, the defendant solicited an investor who was associated with the potential site for Restaurant-2 ("Victim-3") to invest in the project. Victim-3 signed an investment contract with FLOYD in which FLOYD pledged to use the investment funds for the development of Restaurant-2, and Victim-3 was promised to receive his investment back over three years with interest. FLOYD advised Victim-3 that he was the only investor in the Restaurant-2 project, despite having already obtained funds from Victim-1 and Victim-2.

On or about October 21, 2024, Victim-3 gave FLOYD $150,000 as his initial investment in Restaurant-2. FLOYD immediately transferred approximately $120,500 of Victim-3's money to Restaurant-1's Operating Account, which he used to make payroll and pay vendors and interest on the unauthorized merchant cash

advance loans. The defendant converted the remainder of the funds to his personal use by transferring them to an online brokerage account or paying credit card bills.

FLOYD also solicited some of the investors and employees of Restaurant-1 to invest in Restaurant-2 as well. Two of the Restaurant-1 investors (Victim-4 and Victim-5) provided $250,000 to FLOYD as an investment in Restaurant-2 on or about March 4, 2025. FLOYD stole the money by transferring approximately $119,000 to Restaurant-1 to make payroll and pay vendors and interest on the unauthorized merchant cash advance loans; transferring $100,000 to his personal online brokerage account; purchasing cryptocurrency; paying personal credit card bills; and withdrawing it in cash.

After the discovery of the Restaurant-1 embezzlements and his termination as Manager, FLOYD subsequently approached Victim-3 again and requested another $150,000, stating that he was "getting to the finish line" of building out Restaurant-2 but needed more money. Unaware of FLOYD's embezzlement from Restaurant-1, Victim-3 pooled money from friends, and provided FLOYD with the additional $150,000 on or about September 22, 2025. The defendant immediately stole Victim-3's second investment by transferring the vast majority to his personal online brokerage account, and using the rest to pay credit card bills and send money via peer-to-peer transactions.

The total fraud loss amount for FLOYD's scheme to defraud Restaurant-1 and the investors in the Restaurant-2 concept is $1,397,533.56, including $1,159,596.26 in wire fraud proceeds obtained and stolen by FLOYD and

$237,937.30 in loan fees. As detailed above, FLOYD dissipated and disposed of the $1,159,596.26 in wire fraud proceeds he obtained, such that they cannot be located by the United States upon the exercise of due diligence.

Defendant's Initials ______